MURRAY et al. v. SOUTHERN PAC. CO.

(District Court, S. D. California, S. D. May 24, 1915.)

1. CARRIERS ⟷303—INJURIES TO PASSENGERS—NEGLIGENCE.

A brakeman, when informed that a passenger desired to alight at a station and go to a hotel there, informed him that the station was on one side of the track and the hotel on the other, and that when the train reached there he would show the passenger where to get off. The brakeman, on the train reaching the station, at or about the time he opened the door leading down to the steps of the car, said to the passenger, "There is your hotel." The passenger alighted while the train was in motion, and was injured. *Held*, that the carrier was not guilty of any negligence, for the conduct of the brakeman was not an invitation or instruction to the passenger to alight, nor an inducement to the passenger to get into a place of danger causing him to fall from the car.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1216, 1218, 1224, 1226–1232, 1234–1240, 1243; Dec. Dig. ⟷303.]

---

⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CARRIERS ⬦⇒333—PASSENGERS—CONTRIBUTORY NEGLIGENCE.

> A passenger, who alighted on a dark night from a train moving at considerable speed, and who was unfamiliar with the condition of the ground, and who was incumbered with a grip in one hand, was guilty as a matter of law of contributory negligence, precluding a recovery for injuries sustained.
>
> [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1385, 1386, 1388–1397; Dec. Dig. ⬦⇒333.]

At Law. Action by Mary Murray and another against the Southern Pacific Company. Judgment for plaintiffs set aside, and motion for new trial granted.

Theodore A. Bell, of San Francisco, Cal., and Milton K. Young, of Los Angeles, Cal., for plaintiffs.

W. I. Gilbert and W. I. Foley, both of Los Angeles, Cal., for defendant.

BLEDSOE, District Judge. In this case, upon a trial, a verdict was rendered in the favor of plaintiffs in the sum of $5,000, as for the death of plaintiff's intestate, and motion is now made for a new trial by the defendant. After careful consideration of the motion, I believe that it would result in substantial injustice being done to the defendant to permit the verdict to stand, and therefore I am moved to grant the motion of defendant setting aside the verdict herein.

Plaintiff's intestate was killed while alighting from one of defendant's trains at Santa Margarita, in this state. Murray, the deceased, was traveling with a companion from San Francisco to Santa Margarita, and arrived at the latter station about half past 11 at night. The most favorable evidence to plaintiff's contentions in the case is that furnished by Murray's companion, a witness named Moran, and he testifies to the effect that he and Murray were sitting in the smoking car, and that Murray and the defendant's brakeman recognized one another as old acquaintances, and Murray informed the brakeman that he and the witness, Moran, desired to get off at Santa Margarita, and wanted to go to the Santa Margarita Hotel, to which the brakeman replied:

" 'The Santa Margarita Hotel is on the opposite side from the station. The station is on the left side, and the Santa Margarita Hotel is on the right-hand side, and when we get there I will show you where to get off.' So that was about all of the conversation I paid attention to there, for that was all I was interested in."

The witness then continued:

"The whistle blew, and very soon afterwards Mulville, defendant's brakeman, came in from the rear of the smoker, and came down, and called and beckoned to us, and says: 'This is where you fellows get off.' We went back to the rear end of the smoker, and Murray was first, and I followed him. The brakeman was ahead of Murray. He opened the gate, the trap, and the door, on the forward end of the coach immediately behind the smoker, or at the rear end of the smoking car, as we have reference to, and he pointed out and said, 'There is your hotel up there,' and he left at once, and went to the front end of the smoking car. Murray started down the steps, and the train was slowing down, and in fact it was just gliding along, and I was going down after him; but I knew that he was very close to the bottom—must have been on the last

step, and I happened to glance up and saw the light from the car window out on the ground, and I saw we were going quite fast, a great deal faster than I ever thought we were going, and Murray at the same time made an effort to step or get off, or something, and I called to him, and it was too late; he was overbalanced, and he went off. He had a grip in his left hand, and had hold of the hand-hold on the right-hand side. He went to go off, and as I called to him, of course, his grip came down, and he would let it rest on the step, and then pick it up, and he raised his foot to go off, and he started straight back, and the grip swung out, and his left hand swung around, and he just went as quick as that (snapping fingers); he was gone. His back was toward the engine when he fell. When the brakeman pointed out to him and said, 'There is your hotel,' I was immediately back of Murray. We were all pretty well crowded on the platform there. The brakeman was down the steps a ways, and he had to stoop down to point to it, when we were coming in to it. We hadn't got abreast of it. I saw lights, but I couldn't distinguish which one he was pointing out to. It was dark; you couldn't see a thing there. It was very dark, excepting where the lights of the train. * * * It was too dark to see the ground immediately below the step. The only reason why I knew that Murray was making a mistake was because I got a glimpse of the ground from the lights of the car windows down below, the way it would shine out below. * * * I saw then it was going much faster than— Over on the street there were lights, but the street is a considerable distance from the car tracks. I believe they are coal oil or gas lights. They were very dim; they did not flash on the ground; there was no light immediately in front of the steps when he stepped off—absolutely. The brakeman pulled up the trapdoor first and swung that back, then he opened the door, the outside door, of the car; he was in a hurry at the time. He immediately left. After I saw Murray disappear, I went down the steps, and got off, and ran back along until I found him. He was unconscious and died before regaining consciousness. * * * At the time Murray got off, the trapdoors and vestibule doors on the right-hand side of the train were closed. I do not know if they were opened at all. The train had not come to a standstill when I got off. Up to that time the doors on the station side between the smoker and first coach had not been opened, to my knowledge. They were not opened at the time Murray started to descend. Murray was a large man, 5 feet 11 inches high, and weighed about 230 pounds, a great, big, strapping man. * * * There was no platform provided for passengers alighting where Murray attempted to alight; the ground was just the same as you will get along any railroad track where they haven't made provisions for passengers to get off—just like anywhere along the last 50 miles back. * * * Murray was standing as close to the step there as he could, when the brakeman said, 'There is your hotel up there.' I was standing about on the bumpers, just between the cars, or perhaps a little bit over on that car that followed the smoking car. The brakeman was down on the steps. He pointed up, because we hadn't got up there yet. He leaned out and pointed up to the hotel, where we could see the lights of the hotel. He says, 'There is your hotel.' The brakeman then got out; he was in a hurry. That is all the conversation I heard on the platform by any one. * * * Before we reached the station he pointed out the hotel on the opposite side of the station, saying, 'There is your hotel.' Then he turned and walked away after he opened the vestibule door. He didn't say anything about getting off, which side we should get off on, while we were on the platform; just opened the door and walked away. Murray then descended the steps with his grip in his left hand. * * * The train was going perhaps 12 miles an hour, perhaps more; I could not tell. I happened to look out. I was standing back from the steps, and I had to glance up that way to where the light was cast out of the car window, and there I saw the ground. I saw Murray step off; he stepped like he thought there was another step or the ground. I think the train was going 12 miles an hour, fully that. He heard my warning, and tried to recover himself. I was standing behind him. As soon as I saw the rapidity with which the train was moving, I saw it was dangerous, and I knew it wouldn't do for him to attempt to alight, and I called to him. He tried his best to recover himself, but he could not get back. The train ran about seven coaches from where he got off."

[1] Plaintiff's contention at the trial was that defendant was guilty of negligence, in that the words and conduct of its brakeman constituted an invitation or instruction from him to the deceased to alight from the train at the time and place at which he attempted to alight, and, such place being a place of danger, it was neglect for the brakeman thus to indicate to the deceased the duty of alighting thereat. With respect to this, however, it is difficult to see how the suggestion made by the brakeman could be construed into a request or invitation by him for the deceased to alight at the precise time and place at which the accident occurred. It will be noticed from the testimony of deceased's companion that there was no direction on the part of the brakeman that Murray should alight, no suggestion so to do, and the most that was said and done was the statement by him to Murray, "There is your hotel," at or immediately subsequent to the time when he opened the door leading down to the steps of the car. The brakeman's statement to the deceased, in the light of the circumstances as they existed, and assuming that the deceased exercised the due and ordinary care which was required of him, amounted to no more than an invitation or request to alight at a time when the movement of the train would make it safe for him so to do. His companion, Moran, standing behind him, observed that it was dangerous to attempt to alight at the time he actually did, so he, therefore, must have observed the same conditions that Moran observed, there being no evidence to the contrary, and he must have understood, even if he took the brakeman's statement as an invitation to alight, that it was dangerous for him so to do, and he should have refrained from alighting at that time.

[2] It is probably true, as contended by plaintiff, that it is not negligence per se for a passenger to alight from a train while the train is moving. The presence or absence of negligence in such a case would depend upon the concomitant circumstances. The Supreme Court of California in Carr v. Eel River Railway Company, 98 Cal. 366, 33 Pac. 213, 21 L. R. A. 354, approved of an instruction to the effect that:

"Ordinarily a passenger would be held not to be justified in getting off the train while it is in motion, except at his own risk. Unless the train is moving very slowly, and the circumstances are specially favorable, it would be deemed prima facie negligence."

Construing this instruction further the court said:

"A passenger's act in jumping from a moving train may be grossly negligent, and thereby release the carrier from all liability, notwithstanding it was done at the suggestion or upon the assurance of safety by the employé. The employé's advice at the moment is in no sense conclusive upon the passenger as to his negligence or nonnegligence in jumping from the train. Like every other circumstance surrounding the transaction, it casts some light upon the scene, and thereby aids the court, according to the power and brilliancy of its light in each particular case, to determine what a careful, prudent man would have done, placed in the position of the unfortunate passenger. * * * The earlier cases in many instances recognize the principle of negligence per se in alighting from a moving train, but modern authority to a great extent has supplanted that doctrine with broader views upon the question."

Surely in the case at bar there were no circumstances "specially favorable," as referred to by the California Supreme Court, which would tend to remove the prima facie impression of negligence, caused

by one who assumes the risk of attempting to alight from a moving train. On the contrary, the circumstances herein were to my mind more than ordinarily unfavorable. The night was dark, the train was moving at a considerable rate of speed, and the deceased was entirely unfamiliar with the condition of the ground upon which he was to alight. In addition, he was incumbered with a grip or valise in one hand. The danger of attempting to alight under such circumstances was obvious to his companion, who was behind him, and it must have been obvious to him. To attempt to alight in the face of such danger, and in the face of such unpropitious circumstances, was substantially to take his life in his own hands.

The suggestion is made by plaintiff's counsel that he may not have noticed his position and danger, or that he may have lost his hold upon the car, and have fallen off accidentally. There is no proof, however, to support the inference that he fell off accidentally. In any event, there was nothing in the conduct of the brakeman to justify him in placing himself in, or permitting himself to get into, a place of danger, which by the use of the most casual observation and prudence upon his part could have been plainly obvious to him. I can come to no other conclusion than that the death of plaintiff's intestate was due to his want of care, and that to permit the verdict of the jury to stand, and the defendant to be holden responsible therefor, would be to give countenance to a manifest and profound injustice.

For these reasons, the motion for a new trial is granted, and the verdict and judgment heretofore rendered are hereby set aside.